ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KANSAS JUDICIAL WATCH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 06-4056-JAR |
| | ) | |
| MIKEL L. STOUT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

The Court now considers plaintiffs' Motion for Preliminary Injunction (Doc. 5) and

Motion to Consolidate (Doc. 2).[1]  The Court held an evidentiary hearing and heard oral argument

on June 28, 2006.  After fully considering the written briefs, oral argument, and evidence

adduced at the hearing, the Court grants in part and denies in part the motion for preliminary

injunction, as explained more fully below.  The Court denies plaintiffs' motion to consolidate the

injunction with a trial on the merits.

## Factual Background and Plaintiffs' Claims

### I. Background of Judicial Ethics Rules in Kansas

The Kansas Supreme Court adopted Rules Relating to Judicial Conduct on November 13,

1973.[2]  The Kansas Rules were based on the American Bar Association's ("ABA") Draft Model

---

[1]Defendants' Motion for Certification to Kansas Supreme Court (Doc. 40) is also pending before the Court, and is related to many of the issues decided in this Order.  The deadline for plaintiffs' reply memorandum has not yet expired, so it is not ripe for decision.

[2](Def. Ex. 1.)

Code.  The original draft contained a provision stating that a judicial candidate, including an

incumbent judge,

> should not make pledges or promise of conduct in office other than
> the faithful and impartial performance of the duties of the office; or
> misrepresent his identity, qualifications, present position, or other
> fact; or announce his views on disputed legal or political issues,
> except that he may answer allegations directed against his record
> in office."[3]

In 1986, Canon 7B was modified to read that a judicial candidate, including a judge, should not

"make pledges or promise conduct other than the faithful and impartial performance of the duties

of the office."[4]  The remainder of original Canon 7B(1)(c) was excised.

The current Kansas Judicial Code contains five judicial canons that apply to judges and

in some cases to judicial candidates.  Kan. S. Ct. R. 602 established the Commission on Judicial

Qualifications ("the Commission") at the same time the canons were adopted, "to assist the court

in the exercise of its responsibility in judicial disciplinary matters."[5]  The Commission is

comprised of fourteen members—six active or retired judges, four non-lawyers, and four lawyers

appointed by the Kansas Supreme Court.[6]  The Commission is divided into two panels; one is

headed by the Chair of the Commission and the other is headed by the Vice-Chair.  The

Commission is divided to insure that the panel that conducts the investigation is different from

the panel that conducts the hearing, if the case proceeds to the hearing stage.

The disciplinary process begins with the filing of a complaint with the Commission.  The

---

[3](Def. Ex. 1 at 17, Canon 7B(1)(c).)

[4](Def. Ex. 3, Canon 7B(2).)

[5]Kan. S. Ct. R. 602(a).

[6]R. 602(b).  Carol G. Green, Secretary of the Commission, also testified at the hearing about the scope of
the Commission's charge, and the makeup and function of the Commission.

investigatory panel of the Commission then evaluates the complaint and determines an appropriate course of action that can include: dismissal, a letter of caution, informal advice, or public or private cease and desist orders.  If a cease and desist order is resisted by the subject of the complaint, the case goes before the hearing panel.  Moreover, if the investigation panel concludes that formal proceedings should be instituted, it must issue a notice of hearing.[7]

If the hearing panel finds that the charges are proven by clear and convincing evidence, it "shall (1) admonish the judge, (2) issue an order of cease and desist, or (3) recommend to the Supreme Court the discipline or compulsory retirement of the judge."[8]  The hearing panel may also recommend temporary suspension.[9]  If the hearing panel finds either that the charges have not been proven or that no recommendation should be made to the Supreme Court, then the proceedings are terminated.[10]  The hearing panel's findings of fact and conclusions of law are conclusive in the Supreme Court only if no exceptions are filed by the respondent under Rule 623.

In 1984, the Kansas Supreme Court instituted Rule 650, which authorized the creation of the Judicial Ethics Advisory Panel ("the Panel").  The Panel was created to "serve as an advisory committee for judges seeking opinions concerning the compliance of an intended future course of conduct with the Code of Judicial Conduct."  The Panel consists of three retired judges or justices who answer requests for judicial ethics advisory opinions by those subject to the Judicial

---

[7]*See* R. 611.

[8]R. 620.

[9]R. 621.

[10]R. 620.

Code.  The Panel's opinions may not address issues of law nor the ethical propriety of past or present conduct.  The advisory opinions are not binding on the Commission or the Kansas Supreme Court, although the Commission will take into account any advisory opinion relied upon by a judge or judicial candidate.[11]

## II.  The 2006 Candidate Questionnaire

In the State of Kansas, district judges are selected by gubernatorial appointment from a nominating commission in seventeen districts,[12] and through partisan election in fourteen districts, including Sedgwick County.[13]  Plaintiff Kansas Judicial Watch ("KJW") is a political action committee that is not associated with any political candidate, party, or campaign committee.  KJW gathers information and publishes questionnaires about judicial candidates. KJW intends to publish responses to its 2006 Judicial Candidate Questionnaire ("Questionnaire") of judicial candidates before the primary election on August 1, 2006 and would like to do so in future elections, as well.

In February 2006, KJW mailed a cover letter and a Questionnaire to all judicial candidates in Sedgwick County, Kansas, and to all nine of the Kansas Court of Appeals judges. The letter explained that the Questionnaires were due back to KJW by March 13, 2006.  The Questionnaire presents eight propositions about law and policy to judicial candidates and provides five options for the candidate to mark: Agree, Disagree, Undecided, Decline to Respond, and Refuse to Respond.  These eight propositions are:

---

[11]R. 650.

[12]*See Republican Party of Minnesota v. White*, 536 U.S. 765, 791–92 (O'Connor, J., concurring) (discussing the development of this type of judicial selection that became known as the Missouri Plan).

[13]*See* Def. Ex. 11.

1.  The Kansas Supreme Court violated the Separation of Powers provision of the State Constitution in its recent series of rulings in <u>Montoy vs. State</u>, 279 Kan. 817 (2005), mandating specified spending levels for Kansas education funding.

2.  Under the Kansas Constitution, the Kansas State powers to tax its citizens and spend the revenues are the sole prerogative of the Kansas state legislature and not the Kansas Supreme Court.

3.  Under the Kansas Constitution, a statute defining marriage as between one man and one woman is the prerogative of the Kansas State Legislature, not the Kansas Supreme Court.

4.  Marriage should <u>only</u> be between one man and one woman.

5.  Under the United States and Kansas Constitutions, local community standards should be the major determinant of the definition of pornography as a punishable offense.

6.  The Kansas Constitution permits the state legislature to establish or to deny the death penalty as a criminal punishment in the case of first degree murder, and that such a penalty is not to be determined, established or denied by the Kansas Supreme Court.

7.  The unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development.

8.  There is no provision of our current Kansas Constitution that is intended to protect a right to assisted suicide.

The "Decline to Respond" option is accompanied by an asterisk, which reads:

This response indicates that I would answer this question, but believe that I am or may be prohibited from doing so by Kansas Canon of Judicial Conduct 5A(3)(i) and (ii), which forbids judicial candidates from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office" or "statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court."  This response also indicates that I would answer this question, but believe that, if I did so, then I will or may be required to recuse myself as a judge in any proceeding concerning this answer on account of Kansas Canon

> 3E(1), which requires a judge or judicial candidate to recuse him
> or herself when "the judge's impartiality might reasonably be
> questioned . . . ."

KJW alleges in its Complaint that it received seven responses from judicial candidates and that all but one of these candidates marked "Decline to Respond" on all of the eight statements in the Questionnaire.  Plaintiff Robb Rumsey, a 2006 district court judicial candidate in Sedgwick County, marked "Decline to Respond" on all statements in the Questionnaire.  Sedgwick County District Judge Anthony Powell returned the Questionnaire, marking "Decline to Respond" on each statement and also attached a cover letter.  In that cover letter, Judge Powell states:

> Please note that I have declined to respond to every question due to
> the fact that it is my belief that I am or may be prohibited from
> doing so by the Kansas Canons of Judicial Conduct.  Specifically,
> Canon 5A(3) forbids judicial candidates from making pledges or
> promises of conduct in office other than the faithful and impartial
> performance of their duties, and also forbids statements that
> commit or appear to commit the candidate with respect to cases,
> controversies or issues that are likely to come before the court.

In a March 10, 2006 letter, KJW asked both the Commission and the Panel whether judicial candidates could respond to the Questionnaire without fear of discipline.  Carol G. Green, Secretary of the Commission, responded on March 15, 2006, stating that the Commission does not render advisory opinions; rather, advisory opinions sought by judges "concerning the compliance of an intended, future course of conduct with the Code of Judicial Conduct" are the role of the Panel.  In a March 22, 2006 letter, Carol G. Green, in her capacity as Clerk of the Appellate Courts of Kansas, advised that the Panel could not answer KJW's question because requests may only be made by those subject to the Code of Judicial Conduct.

Plaintiff Rumsey also requested an advisory opinion from the Panel, asking if he may

respond to the Questionnaire without fear of discipline.  The Panel issued Judicial Ethics

Opinion JE 139 on April 17, 2006.  Declining to answer Rumsey's question, the opinion states:

> In effect, the candidate seeks to have us hold that various
> provisions of the Code of Judicial conduct, as promulgated by the
> Kansas Supreme Court, are unconstitutional.  This we decline to
> do.  Questions regarding the constitutionality of the Code of
> Judicial conduct should be addressed to the courts, not to this
> panel.  Such action is not within our limited power.  Rule 650(d),
> 2005 Kan. Ct. R. Annot. 603, which establishes this Panel, states:
> "Advisory opinions . . . shall not address issues of law . . . ."
>
> As the Code of Judicial Conduct now stands, it is our
> opinion that the candidate may not answer the questionnaire.  See
> Canon 5A(3)(d)(i) and (ii).

Plaintiffs assert claims under 42 U.S.C. section 1983 that arise under the First and

Fourteenth Amendments.  Plaintiffs claim that "the pledges and promises"and "commit" clauses

of Canon 5A(3)(d)(i),(ii), are unconstitutionally vague and overbroad on their face and prohibit

and chill plaintiffs' freedom of speech and association; and the clauses unconstitutionally

prohibit and chill plaintiffs' freedom of speech and association as applied to the Questionnaire.

Plaintiffs further claim that the Commission's enforcement of the clauses as expressed in

Advisory Opinions JE 100[14] and JE 139 unconstitutionally chills and prohibits plaintiffs'

freedom of speech and association.  With regard to Canon 3E(1)'s Judicial Disqualification

Requirement, plaintiffs claim only that the Canon is unconstitutional as applied to the

Questionnaire.

---

[14]JE 100 is an August 24, 2000 Advisory Opinion, responding to the question whether a judge up for
retention may respond to a questionnaire in a local newspaper.  The editorial committee of the newspaper planned to
base its decision whether to endorse the judge on the judge's responses to those questions.  Two of the three
members of the Panel advised that the judge should not answer the questionnaire because it is essentially a request
for a public endorsement, in violation of Canon 5C(2).  One member of the Panel said that the judge may respond,
but should be mindful of the Canons of Judicial Conduct, "and particularly Canon 5."

## II.  Nomination Petitions

In Kansas, a person may qualify as a candidate for the ballot by either filing nomination petitions or by filing a declaration of intention accompanied by payment of a filing fee.[15] Plaintiff Charles M. Hart is a district judge in Butler County and is a candidate for re-election in 2008.  Judge Hart wishes to personally go door-to-door to ask voters to sign his nomination petition, but he  will not do so because he fears discipline under the canons.  Judge Hart went door-to-door in the last three elections (1996, 2000, and 2004) before the Panel issued Judicial Ethics Opinion JE 117 in March 2004.  This opinion states that a judicial candidate may not seek signatures for a nomination petition because it would constitute "publicly stated support," in violation of Canon 5C(2)'s prohibition of a candidate personally soliciting publicly stated support.

Plaintiffs claim that the "solicitation" clause of  Canon 5C(2) is unconstitutionally vague and overbroad on its face and prohibits and chills plaintiffs' freedom of speech and association. Plaintiffs further claim that the solicitation clause unconstitutionally prohibits and chills plaintiffs' freedom of speech and association as applied to the Questionnaire and as applied to the Nomination Petitions.  And plaintiffs claim that the Commission's enforcement policy of this clause, as expressed in Advisory Opinion JE 100, unconstitutionally chills and prohibits plaintiffs' freedom of speech and association; and the Commission's enforcement policy of this clause as expressed in JE 117 unconstitutionally chills and prohibits the freedom of speech and association of Judge Hart.

## III.  Relief Sought

[15]K.S.A. §§ 25-205, 25-206.  For a district office, the candidate must obtain petitions by at least 3% of the total of the current voter registration of the party designated in the district.  § 25-205(e)(3).

Plaintiffs seek a declaratory judgment that these provisions are unconstitutional on their face, as applied, and as enforced.  Plaintiffs also ask the Court by way of preliminary and permanent injunction, to prohibit defendants from enforcing these judicial canons and from filing or considering complaints based on these canons against judicial candidates who respond to the Questionnaire or solicit signatures for nominating petitions.  Plaintiffs also seek costs and attorneys' fees.

**Analysis**

### I.  Threshold Issues

### A.  *Standing*

Defendants argue that KJW lacks standing to sue because it is not subject to the judicial canons, and because there is no judicial candidate or judge who is currently subject to discipline. Defendants urge the Court to follow the decision in *Pennsylvania Family Institute v. Black*,[16] and dismiss this case for lack of standing.  Article III, section 2 of the U.S. Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies."[17]  In order to satisfy the constitutional standing requirements, KJW must prove: (1) injury in fact; (2) a causal connection between the injury and the challenged act; and (3) a likelihood that the injury will be redressed by a favorable decision.[18]  These are not mere pleading requirements, but are an indispensable part of plaintiffs' case.[19]

---

[16]No. Civ. 105CV2172, 2005 WL 2931825 (M.D. Penn. Nov. 4, 2005)

[17]*Raines v. Byrd*, 521 U.S. 811, 818 (1997).

[18]*Friends of the Earth, Inc. v. Laidlaw Env. Servs.*, 528 U.S. 167, 180–81 (2000); *see also Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004); *Schaffer v. Clinton*, 240 F.3d 878, 882 (10th Cir. 2001) (citations omitted).

[19]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

"[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."[20]  But when a willing speaker exists, First Amendment protection extends not only to the source of a protected communication, but also to the communication itself and to the recipient.[21]  In *Black*, where a similarly situated non-profit research and education organization challenged the judicial canons, the district court found a lack of standing because there was no willing speaker.[22]  There, the court noted: "the instant Plaintiffs, none of whom are judicial candidates themselves, fail to provide any affirmative statements by candidates that would indicate that any of the candidates are willing speakers."[23]  As a result, the plaintiffs in *Black* were unable to establish that any of the candidates would have answered the questionnaire in that case but for the threat of discipline under the judicial canons.

In this case, however, one plaintiff is a 2006 judicial candidate and one plaintiff is a judge who anticipates a 2008 candidacy.  Additionally, plaintiff Rumsey and Judge Anthony Powell submitted letters with their Questionnaires to KJW, explicitly stating that they would respond but for the belief that they could be prohibited from doing so under the canons.  Judge Hart has collected nomination petitions door-to-door in the past, but fears doing so now because of the Panel's advisory opinion that this would amount to solicitation of public support.  Because there are clearly willing speakers in this case, the decision in *Black* is inapposite.  Further,

---

[20]*Id.* at 562.

[21]*Va. State Bd. of Pharm. v. Virginia*, 425 U.S. 748, 756–57 (1976).

[22]*Black*, 2005 WL 2931825, at *5–6.

[23]*Id.* at *6; *see also Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

standing for non-candidates has been found proper in other cases where similar willing speakers were identified.[24]  The Court finds that the First Amendment protection afforded to plaintiffs Rumsey and Hart is extended to KJW as a recipient of protected communications.

### B. Ripeness

Like standing, ripeness is a justiciability doctrine "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."[25]  The issue is related to standing because "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will be satisfied."[26]  Ripeness generally requires the court to evaluate the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration.[27]

The customary ripeness analysis is somewhat relaxed when there is a facial challenge under the First Amendment.[28]  In such a situation, "reasonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim."[29]  The Tenth Circuit has explained that the ripeness framework is relaxed in the First Amendment context because of the chilling effect that burdens on constitutionally protected speech could

---

[24]*See North Dakota Fam. Alliance, Inc. v. Bader*, 361 F. Supp. 2d 1021 (D.N.D. 2005); *Family Trust Foundation of Ky. v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D. Ky 2004), *stay denied pending appeal*, 388 F.3d 224 (6th Cir. 2004); *cf. Alaska Right to Life Political Action Comm. v. Feldman*, 380 F. Supp. 2d 1080 (D. Ala. 2005) (conclusory opinion stating that plaintiffs had established standing with no explanation).

[25]*Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 807 (2003).

[26]*ACLU v. Johnson*, 194 F.3d 1149, 1165 (10th Cir. 1999) (quoting *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)).

[27]*Nat'l Park Hospitality*, 538 U.S. at 808.

[28]*Johnson*, 194 F.3d at 1165.

[29]*Id.* (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (internal quotation omitted)).

cause.[30]  Because this case includes a facial challenge based on the First Amendment, the Court

employs the following flexible inquiry in the context of a facial challenge to the judicial canons:

(1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may

have on First Amendment liberties; and (3) fitness of the controversy for judicial review.[31]

The Court finds that withholding judicial resolution of these matters could cause a

hardship to the parties because the challenged canons create a "direct and immediate dilemma

for the parties."[32]  The record is clear that the plaintiffs here face a dilemma between speaking

and violating a judicial canon, and not speaking and losing a First Amendment liberty.  The

letters and completed Questionnaires show that both plaintiffs Rumsey and Hart face a dilemma

between exercising their First Amendment rights and complying with the judicial canons.  As

discussed under the standing discussion, this dilemma extends to KJW as the recipient of the

information.  Additionally, it is not necessary that the plaintiffs actually be disciplined in order to

be entitled to challenge the canons.[33]  In fact, "'[t]he principle that one does not have to await the

consummation of threatened injury to obtain preventive relief,' 'is particularly true in the

election context, where we [the Supreme Court] often have allowed preenforcement challenges

to restrictions on speech.'"[34]  Still, there must be some credible threat of prosecution.[35]

---

[30]*Gonzales*, 64 F.3d at 1500.

[31]*Id.* (citing *Sierra Club v. Yeutter*, 911 F.2d 1405, 1415 (10th Cir. 1990)).

[32]*Id.* (quotations omitted).

[33]*Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

[34]*Id.* at 1501 (quoting *Babbitt*, 442 U.S. at 298; *Renne v. Gary*, 501 U.S. 312, 332 (1991) (White, J., dissenting)) (further internal quotations omitted).

[35]*Doe v. Bolton*, 410 U.S. 179, 188 (1973).

The Court finds that plaintiffs' fears of discipline under the canons are reasonable. Although there is no evidence in the record that discipline for violating the canons at issue is imminent, the advisory opinions in Kansas suggest that plaintiffs Rumsey and Hart could risk discipline by answering the Questionnaires or personally soliciting nomination petitions. The Court finds that this is sufficient to establish a credible threat of prosecution to satisfy the ripeness requirement.

The second ripeness prong requires the Court to evaluate the chilling effect of the law at issue. "It is generally accepted that the arguable vagueness of a statute greatly militates in favor of finding an otherwise premature controversy to be ripe."[36] Here, plaintiffs challenge on vagueness grounds, all of the canons at issue. Plaintiffs should not be expected to pursue their desired forms of speech "at their peril."

Finally, the Court finds that the issues presented are fit for review. To make this determination, the Court must "focus on whether the challenged law turns upon strictly legal issues or requires facts that may not yet be sufficiently developed."[37] Although the as-applied challenges to these canons involve application of the canons to specific factual scenarios, plaintiffs also make facial challenges to the canons, which are strictly legal questions.[38] The Court concludes that the case is ripe for review.

### C. Abstention

Defendants further argue that the Court should abstain from deciding this case under the

---

[36] *Gonzales*, 64 F.3d at 1503.

[37] *Id.* at 1504.

[38] *Id.*

abstention doctrine announced in *Colorado River Water Conservation District v. United States.*[39]

Defendants maintain that under *Colorado River,* abstention is proper where a case presents a

federal constitutional issue which could be mooted or presented in a different posture by a

determination of state law.  Defendants argue that Kansas has a strong interest in regulating the

conduct of attorneys and judges whom it licenses to practice law.[40]  Also, defendants argue that

the case could be presented in a different posture by a determination of state law.  In other

words, defendants advocate waiting for the state courts to construe the canons at issue after a

candidate or judge actually is charged with a violation.  Abstention under *Colorado River*

requires a parallel state proceeding on the same issues with the same parties.[41]  Because there is

no state court proceeding pending on this matter, the Court finds this abstention doctrine

inapplicable.

Nevertheless, in *Colorado River* the Supreme Court stated that one form of abstention is

appropriate "in cases presenting a federal constitutional issue which might be mooted or

presented in a different posture by a state court determination of pertinent state law."[42]  This

doctrine is commonly referred to as *Pullman* abstention.[43]  The Court should abstain under

*Pullman* when three conditions are met: (1) an uncertain issue of state law underlies the federal

---

[39]424 U.S. 800, 814 (1976).

[40]Plaintiffs have asked the Court to certify a question concerning the pledges and promises and commit clause to the Kansas Supreme Court, asking if it is to be construed in the same fashion as the announce clause in *White*.  The Court declines to rule on that motion at this time since it is not fully briefed.

[41]*United States v. City of Las Cruces,* 289 F.3d 1170, 1182 (10th Cir. 2002) (explaining that the Circuit requires a threshold finding of parallel state court proceedings to engage in *Colorado River* abstention).

[42]*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813-14 (1976).

[43]*See R.R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).  Defendants acknowledged during oral argument that they seek abstention under *Pullman* rather than *Colorado River*.

constitutional claim; (2) the state issues are amenable to interpretation and such interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law by the district court would hinder important state law policies.[44] "Abstention is a narrow exception to the duty of a district court to adjudicate a controversy properly before it, and is used only in exceptional circumstances."[45]

Although a state court adjudication of the canons in this case might present the constitutional questions in a different posture, the Court rejects defendants' request for abstention. Although the case involves state judicial canons, the outcome of this litigation turns on an interpretation of federal constitutional law. Because plaintiffs are exercising their right to bring a claim under 42 U.S.C. section 1983, and the delay from abstaining could perpetuate the alleged chilling effect on their First Amendment rights, the Court does not find *Pullman* abstention appropriate in this case.[46]

## II.  Preliminary Injunction Standard

To obtain a preliminary injunction, the moving party must show a clear and unequivocal right to relief.[47]  The moving party must establish the following elements to obtain relief: (1) a substantial likelihood of success on the merits; (2) a showing of irreparable injury unless

---

[44]*Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir. 1992) (citing *Vinyard v. King* , 655 F.2d 1016, 1018 (10th Cir. 1981)).

[45]*S&S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 442 (10th Cir. 1991) (citing *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959)).

[46]*See Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1576 (10th Cir. 1995); *Kansas for Life, Inc. v. Gaede*, 38 F. Supp. 2d 928, 934 (D. Kan. 1999).

[47]*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).

the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.[48]  In cases where the movant has prevailed on the other factors, the Tenth Circuit generally uses a liberal standard for "probability of success on the merits," so the moving party need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[49]

There are three types of injunctions that are disfavored in the Tenth Circuit, and thus, are subjected to a heightened burden.  Those injunctions are: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.[50]  If an injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.  Furthermore . . . movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[51]

Defendants argue that the injunction at issue is mandatory.  The Circuit has described the difference between a mandatory and prohibitory injunction as follows:

> [t]he distinction between mandatory and prohibitory injunctions . . . cannot be drawn simply by reference to whether or not the

---

[48]*E.g.*, *id.*; *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

[49]*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980) (internal quotations omitted).

[50]*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd*, 126 S. Ct. 1211 (2006); *see also Schrier*, 427 F.3d at 1258–59.

[51]*O Centro*, 389 F.3d at 975–76.

> *status quo* is to be maintained or upset. As suggested by the
> terminology used to describe them, these equitable cousins have
> been differentiated by examining whether the non-moving party is
> being ordered to perform an act, or refrain from performing. In
> many instances, this distinction is more semantical than
> substantive. For to order a party to refrain from performing a given
> act is to limit his ability to perform any alternative act; similarly,
> an order to perform in a particular manner may be tantamount to a
> proscription against performing in any other.[52]

And, "[w]e characterize an injunction as mandatory if the requested relief 'affirmatively

require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court

in a position where it may have to provide ongoing supervision to assure the nonmovant is

abiding by the injunction.'"[53]

The Court disagrees that the requested injunction is a mandatory, or otherwise

disfavored, injunction.  Plaintiffs ask that the Court enjoin "Defendants, their agents, successors

from enforcing Kansas Judicial Canon 5A(3)(i) and (ii), Kansas Judicial Canon 3E(1), and

Kansas Judicial Canon 5C(2), and from filing or considering complaints based on these Canons

against judicial candidates who respond to 2006 Candidate Questionnaire or solicit signatures for

nominating petitions and all others similarly situated."[54]  The Court finds that the requested

injunction neither seeks to change the status quo, nor is mandatory in nature.  Defendants admit

that there is no current disciplinary proceeding pending against a judicial candidate or judge

under the challenged canons.  Therefore, there is no indication that the requested injunction

would alter the status quo.  The injunction does not seek, as defendants suggest, to change the

---

[52]*Id.* at 1006 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025-26 (2d Cir.1985), *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n.2 (1987)).

[53]*Schrier*, 427 F.3d at 1261 (quoting *O Centro*, 389 F.3d at 979) (internal quotation omitted).

[54](Doc. 1 at 27.)

Model Code.  Instead, it asks that the status quo be preserved by prohibiting potentially unconstitutional enforcement of the canons until the case can be decided on the merits.  Finally, because plaintiffs seek declaratory relief, the injunction would not provide all of the relief sought at the conclusion of a trial on the merits.

Nevertheless, this Court rejects plaintiffs' argument that the modified likelihood-of-success-on-the-merits test should apply since they do not seek a disfavored injunction.  The liberal definition of this test would lessen the need for plaintiffs to show a substantial likelihood of success when the other requirements for a preliminary injunction are satisfied.  But the Circuit has held that "where . . . a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the less rigorous fair-ground-for-litigation standard should not be applied."[55]  Therefore the Court applies the four-prong preliminary injunction scheme, but applies neither the more rigorous standard applicable to disfavored injunctions, nor the more liberal modified scheme.

### III.   Substantial Likelihood of Success on the Merits

#### A.   First Amendment Legal Standards

#### 1.   Republican Party of Minnesota v. White

Plaintiffs argue that certain judicial canons should be declared unconstitutional primarily under *Republican Party of Minnesota v. White*.[56]  Minnesota provides for the selection of all

---

[55]*Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006).

[56]536 U.S. 769 (2002).

state judges by popular election.  In *White*, the Supreme Court considered Minnesota Code of

Judicial Conduct, Canon 5(A)(3)(d)(i), the "announce clause," which prohibited judicial

candidates and incumbent judges from announcing his or her "views on disputed legal or

political issues."

Under Minnesota's announce clause, judicial candidates, including incumbent judges,

were subject to punishment if they violated the Canon.  One of the petitioners, Gregory Wersal,

ran for associate judge of the Minnesota Supreme Court in 1996.  Wersal distributed literature

during his campaign, criticizing several decisions by the Minnesota Supreme Court on issues

such as abortion, crime, and welfare.  A disciplinary complaint was filed against Wersal,

charging that the material violated the announce clause; the complaint was dismissed.

Nonetheless, Wersal withdrew from the election, fearing ethical complaints could hurt his ability

to practice law.  In 1998, Wersal ran again for the same position, but this time sought an

advisory opinion from the Lawyers Board about whether it intended to enforce the announce

clause.  The Lawyers Board responded that, although it had significant doubts about the

constitutionality of the clause, it would not answer his questions because he had not provided

them with concrete examples of the announcements he wished to make.  Other plaintiffs in the

suit, including the Minnesota Republican Party, alleged that the announce clause meant that they

were unable to learn the candidate's views and support or oppose the candidacy accordingly.[57]

In the majority opinion, the Court described the distinction between the announce clause

and the "pledges or promises clause," which was *not* before it:

The prohibition extends to the candidate's mere statement of his

---

[57]*Id.* at 768–70.

current position, even if he does not bind himself to maintain that position after election.  All the parties agree this is the case, because the Minnesota Code contains a so-called "pledges or promises" clause, which separately prohibits judicial candidates from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office," *ibid.*—a prohibition that is not challenged here and on which we express no view.[58]

The Eighth Circuit Court of Appeals applied strict scrutiny and the parties agreed that strict scrutiny applied.[59]  Strict scrutiny requires the law be narrowly tailored to further a compelling government interest.[60]  The Supreme Court identified two compelling state interests argued by respondents: (1) preserving the impartiality of the state judiciary, and (2) preserving the appearance of the impartiality of the state judiciary.[61]  The Court found that there were three alternate meanings of "impartiality," and proceeded to apply the strict scrutiny test for each.  The first interpretation is a lack of bias for or against either party to the proceeding.  The Court found that the announce clause was not narrowly tailored to serve this type of impartiality.[62]  The Court found that the announce clause did not restrict speech for or against *parties*, but rather, for or against particular issues.[63]  *Any* party taking a position contrary to that of an announced position of the judge would lose—therefore, the judge would be applying the law (as they see it)

---

[58]*Id.* at 770.

[59]*Id.* at 774–75.

[60]*Id.*

[61]*Id.* at 775.

[62]*Id.* at 776.

[63]*Id.* at 777.

evenhandedly.[64]

The second interpretation of impartiality was described as lack of bias on issues, which concerns guaranteeing litigants an equal chance to persuade the court on the legal points in their case.[65]  The Court found that this is not a compelling state interest because "it is virtually impossible to find a judge who does not have preconceptions about the law."[66]  In fact, the Court indicated that the avoidance of judicial preconceptions on legal issues is not only not possible, but not desirable, quoting Justice Rehnquist's observation that "'[p]roof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.'"[67]

The Court described the third interpretation of impartiality as "open-mindedness."  This meaning requires a judge to "be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case."[68]  While not guaranteeing each litigant an equal chance to win legal points, it assures each some chance of doing so.  The Court concluded that although this type of impartiality may be desirable, the Minnesota Supreme Court did not adopt the announce clause for this purpose.[69]  The clause is "woefully underinclusive as to render belief in that purpose a challenge to the credulous."[70]  Justice

---

[64]*Id.*

[65]*Id.*

[66]*Id.*

[67]*Id.* at 778 (quoting *Laird v. Tatum*, 409 U.S. 824, 835 (1972)).

[68]*Id.*

[69]*Id.*

[70]*Id.* at 780.

Stevens' dissent posits that statements made in a campaign are a special threat to open-mindedness because the candidate, when elected judge, will have a particular reluctance to contradict them.  The majority view was that this threat might be true for campaign *promises*, but not for nonpromissory statements, while noting that "one would be naive not to recognize that campaign promises are—by long democratic tradition—the least binding form of human commitment."[71]

The Court held that the announce clause in Minnesota did not pass strict scrutiny.  The Court stated that there is "obvious tension" between the state's constitutional provision that judges be elected and the announce clause.[72]  Justice Scalia pointed out that "the ABA, which originated the announce clause, has been an opponent of judicial elections. . . . [B]ut the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about."[73]

### 2. Overbreadth and Vagueness Doctrines

Overbreadth and vagueness are viewed by the Supreme Court as "logically related and similar doctrines."[74]  These doctrines may even overlap when "the challenged statute is so unclear in its scope that officials enforce it in an overbroad manner."[75]  Facial challenges for vagueness and overbreadth involve a preliminary inquiry: the plaintiffs must show that the

---

[71]*Id.*

[72]*Id.* at 787.

[73]*Id.* at 788.

[74]*Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)).

[75]*Id.* at 828.

potential chilling effect on protected expression is "both real and substantial."[76]

In the context of overbreadth, the chilling effect must be real and substantial, judged in relation to the law's plainly legitimate sweep.[77]  This inquiry involves an analysis of the scope of the law.  The court's first task is to determine "whether the enactment reaches a substantial amount of constitutionally protected conduct."[78]  For the doctrine of  "[o]verbreadth is 'strong medicine,' and courts 'employ[] it with hesitation, and then, only as a last resort.'"[79] A showing of overbreadth "suffices to invalidate *all* enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'"[80] Because an overbroad law may "chill" protected speech, suspension of all enforcement is the only means of reducing "these social costs caused by the withholding of protected speech."[81]

A law may be challenged as vague after this initial inquiry, when the law is "'not readily subject to a narrowing construction by the state courts.'"[82]  However, "speculation and 'hypertechnical theories as to what the statute covers' cannot create vagueness, especially when the statute is 'surely valid in the vast majority of its intended applications.'"[83] Also, when a

---

[76]*Id.* (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975)).

[77]*Id.*

[78]*Id.* (quoting *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982)).

[79]*Faustin v. City and County of Denver, Colo.*, 423 F.3d 1192, 1199 (10th Cir. 2005) (quoting *West v. Derby Unified Sch. Dist.* , 206 F.3d 1358, 1367 (10th Cir. 2000)).

[80]*Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003).

[81]*Id.* at 119.

[82]*Id.* at 1202 (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60–61 (1976)).

[83]*Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2002)).

plaintiff knows that "the action in question violated the restriction, we have said that this 'state of mind is inconsistent with any claim that the policy did not give . . . fair warning. . . .'  In such a case, we will not conclude that the policy is unconstitutionally vague."[84]

### B.  The Pledges and Promises Clause and the Commit Clause

Plaintiffs assert, via section 1983 and the Fourteenth Amendment, a facial and as-applied First Amendment challenge to Canon 5A(3)(d)(i) and (ii) of the Kansas Supreme Court's Rules of Judicial Conduct.  Plaintiffs assert that the clauses do not survive strict scrutiny, are overbroad, and vague.  Kansas does not currently have an announce clause, having abolished it in 1984, but instead has the "pledges and promises clause" and  "commit" clause:

> (3) A candidate for a judicial office:
> (d) shall not:
>> (i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office;
>> (ii) make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court.[85]

Federal lawsuits challenging the pledges and promises clause and the commit clause were filed in September 2004 in Alaska, Indiana, Kentucky, and North Dakota.[86]  The preliminary injunction was denied in the Indiana case and a discovery and dispositive motion deadline was set for September 6, 2005.[87]  The Court is unaware of any other progress since that time in that

---

[84]*Id.* (quoting *West*, 206 F.3d at 1368).

[85]Kan. S. Ct. R. 601A, Canon 5A(3)(d)(i), (ii).

[86]*See North Dakota Fam. Alliance, Inc. v. Bader*, 361 F. Supp. 2d 1021, 1030 n.1 (D.N.D. 2005).

[87](Doc. 28, Attach.)

24

case.  The district courts in Alaska and North Dakota granted summary judgment to the plaintiffs

after finding that the pledges and promises and commit clauses in those states violated the First

Amendment under the holding in *White*.[88]  And, the Kentucky district court granted a motion for

preliminary injunction, finding a likelihood that plaintiffs would succeed on the merits of their

First Amendment challenges to the pledges and promises and commit clauses.[89]  A motion to

stay the injunction was thereafter denied by the Sixth Circuit.[90]

There have been two state court decisions on the constitutionality of these clauses since

*White*.  The New York Court of Appeals upheld New York's pledges and promises clause;[91] and

the Florida Supreme Court upheld Florida's pledges and promises and commits clauses on First

Amendment grounds.[92]  Both of those decisions were rendered in appeals from disciplinary

actions filed against judicial candidates under the judicial canons.  Understandably, both parties

spend much of their briefs attempting to analogize and distinguish this case from the facts and

contexts of these other federal and state cases.

### 1.  Facial Analysis

---

[88]*Bader*, 361 F. Supp. 2d at 1021–45; *Alaska Right to Life Political Action Comm. v. Feldman*, 380 F. Supp. 2d 1080–84 (D. Ala. 2005).

[89]*Family Trust Foundation of Ky, Inc. v. Wolnitzek*, 345 F. Supp. 2d 672, 695 (E.D. Ky. 2004).

[90]388 F.3d 224 (6th Cir. 2004).  In 2005, the Kentucky Supreme Court amended its Canon 5(B)(1)(c) to read:

> A judge or candidate for election to judicial office shall not intentionally or recklessly make a statement that a reasonable person would perceive as committing the judge or candidate to rule a certain way on a case, controversy, or issue that is likely to come before the occur; and shall not misrepresent a candidate's identity, qualifications, present position, or other facts.

Ky. S. Ct. R. 4.300 (amended Sept. 15, 2005).

[91]*In re Watson*, 794 N.E.2d 219 (N.Y. 2003).

[92]*In re Kinsey*, 842 So.2d 77 (Fla. 2003).

Plaintiffs allege that the pledges and promises clause and the commit clause violate the First Amendment because their literal meaning abridges the right to free speech.  This challenge is a "heavy burden" and "'is, manifestly strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'"[93] The plaintiffs "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech."[94]  Plaintiffs argue that the clauses are facially unconstitutional because they do not survive strict scrutiny, are overbroad, and vague.

### Strict Scrutiny

As a threshold matter, defendants argue that this Court is not bound to apply strict scrutiny under the holding in *White*, explaining that the Supreme Court only applied strict scrutiny because the parties stipulated that it was the appropriate test.  Yet defendants fail to identify the appropriate alternative test or justify why it is more applicable than strict scrutiny. This Court concludes that it must apply strict scrutiny, for the speech restriction at issue here is content based—the type of speech regulated is defined by the fact that it is intended "to influence the voters in an elections."[95]  "[T]he ability of the citizenry to make informed choices among candidates for office is essential . . . . When a law burdens core political speech, we apply 'exacting scrutiny.'"[96]  Under strict scrutiny, the Court may uphold the restriction only if it is

---

[93]*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

[94]*Id.*

[95]*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995); *see also Republican Party of Minn. v. White*, 536 U.S. 769, 774 (2002) (recognizing that speech about the qualifications of candidates for public office is within a category of speech "at the core of our First Amendment freedoms").

[96]*McIntyre*, 514 U.S. at 346–48.

narrowly tailored to serve a compelling state interest.[97]

Defendants assert that the pledges and promises and commit clauses serve the compelling state interest in judicial impartiality and the appearance of judicial impartiality by assuring open-mindedness in the judiciary.  In *White*, the Court identified three possible interpretations of the meaning of "impartiality."  The only one of these three interpretations that the Court explicitly found compelling is impartiality defined as lack of bias against either party to the proceeding.[98]  Plaintiffs correctly argue that the Supreme Court stopped short of declaring open-mindedness a compelling state interest.  Instead, the Court stated that "we need not pursue that inquiry, since we do not believe the Minnesota Supreme Court adopted the announce clause for that purpose."[99]  However, this Court follows the courts that have construed *White*, and evaluated open-mindedness as a compelling state interest.[100]

Unlike the announce clause, the pledges and promises and commit clauses do further the interest in open-mindedness by the judiciary.  In *White*, the Court rejected an open-mindedness justification because it found that this goal contradicted a different canon that encouraged judges to express legal views though speeches and books[101] and because it found that the announce clause was underinclusive since it did not regulate speech prior to and after a judicial

---

[97]*White*, 536 U.S. at 774–75.

[98]*Id.* at 775–76.

[99]*Id.* at 778.

[100]*North Dakota Family Alliance, Inc.*, 361 F. Supp. 2d 1021, 1040 (D.N.D. 2005); *Family Trust Foundation of Ky, Inc. v. Wolnitzek*, 345 F. Supp. 2d 672, 695 (E.D. Ky. 2004), *emergency stay denied*, 388 F.3d 224 (6th Cir. 2004); *In re Watson*, 794 N.E.2d 219 (N.Y. 2003); *see also* Model Code of Judicial Conduct, Canon 5.01, cmt. 14 (Proposed Final Draft Dec. 2005).

[101]*See* Minn. Code of Judicial Conduct, Canon 4(B) (2002).

campaign.[102]  Unlike announcements, there is no canon that encourages judicial candidates to promise or pledge or commit to rule a particular way in a case or controversy or issue likely to come before the court.[103]  Also, the underinclusiveness argument is not as persuasive when applied to these clauses because "the only time a promise to rule a certain way has any meaning is in the context of a judicial campaign."[104]  By comparison, an announcement carries the same meaning whether made before, during, or after an election.  The Court finds that the pledges and promises and commit clauses are narrowly tailored to serve the state interest of impartiality, meaning open-mindedness.

Defendants do not argue that the pledges and promises or commit clauses further impartiality in the sense of lack of bias toward parties, but the Court will nevertheless proceed to analyze this compelling state interest.  The Court finds that like the announce clause, the pledges and promises and commit clauses in this case are not narrowly tailored to serve this compelling state interest.  The pledges and promises clause forbids all pledges and promises of conduct by judicial candidates, other than "the faithful and impartial performance of the duties of the office." But this clause does not simply restrict speech for or against a particular party.  Instead, it prohibits speech that pledges or promises any specific conduct when elected.[105]  Like the announce clause in *White*, the Court finds that this clause essentially seeks to regulate

---

[102]*Id.* at 779–80.

[103]*See id. at* 777–78; *Wolnitzek*, 345 F. Supp. 2d at 696.

[104]*Wolnitzek*, 345 F. Supp. 2d at 696. *Cf.* Model Code of Judicial Conduct, Canon 2.11(C) (Proposed Final Draft Dec. 2005) (prohibiting pledges and promises and commitments by sitting judges).

[105]The Court acknowledges that the commentary to the Canon states that the Canon does not prohibit a candidate from making pledges or promises with respect to improvements in court administration, nor does it prohibit a sitting judge from pledging or promising or committing when privately speaking to other judges or court personnel in the course of judicial duties.

impartiality towards issues and not parties.  As the Court explained, impartiality regarding legal views is not a compelling state interest.[106]

Likewise, the commit clause is not narrowly tailored to further the compelling state interest of lack of bias toward parties.  The clause prohibits a candidate from committing or appearing to commit with respect to cases, controversies, or issues that are likely to come before the court.  The clause is not narrowly tailored to serve the compelling state interest of avoiding bias, or the appearance of bias, against parties because it prohibits commitments on any issue likely to come before the court.  The fact that the clause is limited to issues that are likely to come before the court is of no consequence because "[t]here is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction."[107]

The Court finds, with respect to impartiality meaning bias against parties, that there is little difference between a judicial candidate announcing his or her views on legal or political issues and making promises or pledges, or committing with respect to cases, controversies, and issues that are likely to come before the court.  The Court finds that, similar to the announce clause in *White*, these clauses are not necessary to achieve the state's interest in judicial impartiality.  As will be discussed later in this opinion, the recusal provision in Canon 3E requires a judge to recuse whenever that judge is unable to render a fair decision, or whenever it appears that the judge is unable to render a fair decision.  The recusal provision operates without inhibiting protected speech because it is narrowly tailored to serve the interest of avoiding bias

---

[106]*White*, 536 U.S at 777.

[107]*Id.* at 772 (quoting *Buckley v. Illinois Judicial Inquiry Bd.*, 997 F.2d 224, 229 (7th Cir. 1993)).

against parties.

### *Overbreadth*

Although the Court has determined that the pledges and promises and commit clauses are narrowly tailored to further the state's interest in judicial impartiality, meaning "open-mindedness," the Court must still evaluate the effect of the clauses on free speech rights under the overbreadth doctrine.  To establish overbreadth, plaintiffs must show a real and substantial chilling effect on free speech rights, in relation to the Canon's "plainly legitimate sweep."[108]  As discussed under the strict scrutiny analysis, the plainly legitimate sweep of the clauses at issue would be a prohibition of statements to rule a particular way in a case, controversy, or issue likely to come before the court.  "A campaign promise to rule a certain way on a legal issue likely to come before the court is so uniquely destructive of open-mindedness and confidence in the judiciary that recusal might not satisfactorily protect the state's interest in maintaining judicial open-mindedness."[109]

In *White*, the Court distinguished the announce clause by explaining that it covered "much more than *promising* to decide an issue a particular way."[110]  Nonetheless, the sweep of the promises and pledges and commit clauses is not limited to pledges, promises and commitments to decide an issue a particular way.  The pledges and promises clause prohibits all promises and pledges of conduct in office except for those promises of faithful and impartial execution of the duties of the office.  Likewise, the commit clause prohibits any commitment

---

[108]*Faustin v. City & County of Denver, Colo.*, 423 F.3d 1192 (10th Cir. 2005).

[109]*Wolnitzek*, 345 F. Supp. 2d at 702 n.12.

[110]*White*, 536 U.S. at 770.

about any issue likely to come before the court.  The Court has already acknowledged the *White* Court's finding that the "likely to come before the court" restriction is not truly much of a restriction, as almost any non-fanciful issue could be considered likely to come before a court of general jurisdiction.  The Supreme Court also commented on the "naive" assumption that commitments made during campaigns are in fact binding.[111]  The Court agrees with the Eastern District of Kentucky that the clause does not limit itself to prohibiting commitments to "*rule* a particular way on an issues [sic] likely to come before the court; rather it simply limits any commitment about any issue likely to come before the court."[112]  The Kentucky district court illustrated that the legitimate reach of the Canon is much narrower than the illegitimate reach by comparing examples of each.  Its examples of legitimate speech targeted by the Canon are: "I promise to be tough on crime," or "I promise to uphold the First Amendment."  Its narrower example of illegitimate speech targeted by the Canon is: "I promise to never invalidate a search on Fourth Amendment grounds."[113]

The Court also looks at how the State has interpreted these clauses to determine facial validity.[114]  Here, the record reflects that there has only been one instance of a disciplinary proceeding under the pledges and promises clause in Kansas since its original adoption and no

---

[111]*Id.* at 780.

[112]*Wolnitzek*, 345 F. Supp. 2d at 697.  See *Watson* and  *Kinsey* for state court decisions that upheld application of the Canon to pledges and promises and commitments in the latter category of speech.  *In re Kinsey*, 842 So.2d 77, 88–89 (Fla. 2003) ("While our judicial code does not prohibit a candidate from discussing his or her philosophical beliefs, in the campaign literature at issue Judge Kinsey pledged her support and promised favorable treatment for certain *parties and witnesses* who would be appearing before her (i.e., police and victims of crime).); *In re Watson*, 794 N.E.2d 1, 7 (N.Y. 2003) ("The rule precludes only those statements of intention that single out a party or class of litigants for special treatment . . . or convey that the candidate will behave in a manner inconsistent with the faithful and impartial performance of judicial duties if elected.").

[113]*Wolnitzek*, 345 F. Supp. 2d at 697.

[114]*See Lewis v. New Orleans*, 415 U.S. 130, 131–32 (1974).

cases concerning the commit clause.  In *In re Baker*,[115] the Commission found a violation of the pledges and promises clause when a judicial candidate made a radio speech and television advertisement emphasizing his pledge to be a "full-time judge" and to eliminate court delays.[116] That judicial candidate was running against an incumbent judge whose health problems had resulted in a reduced workload.  The Kansas Supreme Court did not agree with the Commission's conclusion that these statements violated the pledges and promises clause because they were statements that related to the faithful performance of the duties of judicial office.[117] The Kansas Supreme Court stated:

> A candidate for nonjudicial office is free to announce his stand on the issues he must pass upon in office, and to pledge his vote on those issues; the judicial candidate is forbidden to enter this customary campaign arena.  Hence, unless the election is to be a pure popularity contest based on name recognition alone, the only legitimate area for debate is the relative qualifications of the candidates.  In our view the health, work habits, experience and ability of the candidates are all matters of legitimate concern to the electorate who must make the choice.[118]

Despite the dearth of disciplinary complaints concerning the clauses, plaintiffs posit that the Panel's advisory opinion, JE 139, signals the State's intention concerning enforcement of the Canon.  In Kansas Advisory Opinion JE 139, the Panel answered plaintiff Rumsey's request for advice on whether he could answer the Questionnaire at issue in this case.  The Panel rejected the opportunity to rule on the constitutionality of the clauses, but stated that "[a]s the Code of

---

[115]542 P.2d 701 (Kan. 1975).

[116]*Id.* at 704.

[117]*Id.* at 705.  The court did, however, find a violation of another part of Canon 7 B(1)(c), which states that a candidate "should not . . . mispresent (sic) his identity, qualifications, present position, or other fact.  *Id.* at 703, 706–07.

[118]*Id.*

Judicial Conduct now stands, it is our opinion that the candidate may not answer the questionnaire.  See Canon 5A(3)(d)(i) and (ii)."[119]

Defendants argue that the Panel's advisory opinions should not be considered because they are not binding on the Commission, nor the Kansas Supreme Court.  Although these advisory opinions are not binding, the Court must consider the chilling effect of these advisory opinions on protected speech.  By interpreting the clauses as prohibiting judicial candidates and incumbent judges from answering the Questionnaires, the Panel chills protected speech.  The clauses have been interpreted to operate as a *de facto* announce clause.  Plaintiffs have met their burden of showing a real and substantial threat that the pledges and promises clause and commit clause chill the free speech rights of third parties who fear discipline for answering the Questionnaire, in relation to the plainly legitimate sweep of the clauses.

### Vagueness

Having already determined that the Canon has a real and substantial effect on legitimate expression, the Court must determine whether the pledges and promises or commit clauses are impermissibly vague.   The Supreme Court has explained the characteristics of vague laws:

> Vague laws may trap the innocent by not providing fair warning.
> Second, if arbitrary and discriminatory enforcement is to be
> prevented, laws must provide explicit standards for those who
> apply them.  A vague law impermissibly delegates basic policy
> matters to policemen, judges, and juries for resolution on an ad hoc
> and subjective basis. . . . "Uncertain meanings inevitably lead
> citizens to 'steer far wider of the unlawful zone' . . . than if the
> boundaries of the forbidden areas were clearly marked."[120]

---

[119](Doc. 1, ex. J.)

[120]*Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 514, 526 (1958))) (footnotes omitted).

33

Plaintiffs spend little time explaining their vagueness challenge to the pledges and promises clause, failing to explain how the terms "promise" or "pledge" are vague. Instead, plaintiffs focus on the "appear to commit" language in the commit clause, arguing that it is vague because the Panel has interpreted it as forbidding statements on disputed legal and political issues. The Panel has advised that answering the Questionnaire would be a violation of the Canon, without commenting on its constitutionality. The Court has already determined that the Canon is enforced in an overbroad manner. Nevertheless, candidates were placed on notice by JE 139 that responding to the Questionnaire would be a violation. Because plaintiffs were aware that their desired activities would constitute a violation of these clauses, the Court declines to hold that they are unconstitutionally vague.

### 2. As-applied Challenge

None of the statements on the Questionnaire in this case require the candidate to pledge, promise, or commit to any position in contravention of the pledges and promises and commit clauses. These statements merely require the candidates to announce their views on disputed legal and political issues. Prohibiting judicial candidates from announcing their views on disputed legal and political issues is in contravention of the Supreme Court's holding in *United States v. White*. Accordingly, the Court finds the pledges and promises and commit clauses unconstitutional as applied to the Questionnaire.

### C. Recusal Canon

The plaintiffs argue that Canon 3E(1) is unconstitutional as applied to the Questionnaire because it chills speech by subjecting judges to discipline for announcing their views on disputed legal and political issues. The Canon states that a judge must recuse himself or herself when his

or her "impartiality might reasonably be questioned . . . ." The Rule goes on to provide four instances where a judge's impartiality might reasonably be questioned: personal bias concerning a party, prior personal involvement in a case, economic interest, and involvement of the judge or relative of the judge in the proceeding.[121] Under this Canon, "the standard is whether the charge of lack of impartiality is grounded on facts that would create reasonable doubt concerning the judge's impartiality in the mind of a reasonable person with knowledge of all the circumstances."[122]

For the same reasons as discussed under the analysis of the promises and pledges and commit clauses, the Court applies strict scrutiny. The Court finds that, unlike the previously considered clauses, the recusal Canon is narrowly tailored to serve the compelling state interest of judicial impartiality and the appearance of impartiality. First, it is narrowly tailored to serve the interest of removing bias against parties. The purpose of the recusal canon is to guarantee to litigants that the judge will apply the law to them in the same way. When a judge is biased for or against a party, or it appears that the judge is biased for or against a party, the recusal statute requires the judge to remove himself or herself from the case. The recusal Canon is also narrowly tailored to serve the compelling government interest in open-mindedness. The recusal Canon requires a judge to recuse if he or she is unable to maintain an open mind about the results of a particular case until all of the evidence and arguments have been presented.[123] The standard

---

[121]Kan. S. Ct. R. 601A, Canon 3E(1).

[122]*State v. Logan*, 689 P.2d 778, 784 (Kan. 1984).

[123]*Accord North Dakota Fam. Alliance, Inc. v. Bader*, 361 F. Supp. 2d 1021, 1043–44 (D.N.D. 2005); *Alaska Right to Life Pol. Action Comm. v. Feldman*, 380 F. Supp. 2d 1080 (D. Alaska 2005); *Family Trust Foundation of Ky, Inc. v. Wolnitzek*, 345 F. Supp. 2d 672, 696 (E.D. Ky. 2004), *emergency stay denied*, 388 F.3d 224 (6th Cir. 2004). Plaintiffs argue that these cases were all based on facial challenges to the recusal canons. The Court disagrees. These courts specifically recited plaintiffs' challenge in that case as including as-applied challenges

of impartiality required to warrant recusal has been well established in Kansas.  The Court finds that plaintiffs are not substantially likely to succeed on the merits of their as-applied challenge to the recusal Canon.

### D.  Solicitation Clause

Canon 5(C)(2) states:

> A candidate* shall not personally solicit or accept campaign contributions or solicit publicly stated support nor shall a candidate serve as his or her own campaign treasurer.  A candidate subject to public election* may, however, establish committees of responsible persons to solicit and accept reasonable campaign contributions, to manage the expenditure of funds for the candidate's campaign and to obtain public statements of support for his or her candidacy. Such committees may solicit and accept reasonable campaign contributions and public support from lawyers.   A candidate's committees may solicit contributions and public support . . . no earlier than one year before an elections and no later than 90 days after the last elections in which the candidate participates during the election year.[124]

Plaintiffs claim that the solicitation clause does not survive a strict scrutiny analysis, is vague and overbroad and that it is unconstitutional as applied to both the Questionnaire and nomination petitions.

The Eighth and Eleventh Circuits have both struck down similar solicitation clauses as unconstitutional prohibitions on free speech under *White*.[125]  The Eighth Circuit addressed the solicitation clause in *White* on remand from the Supreme Court. There, the plaintiff wished to

---

to the surveys at issue.  *Wolnitzek*, 345 F. Supp. at 705; *Bader*, 361 F. Supp. 2d at 1043.

[124]Kan. S. Ct. R. 601A, Canon 5C(2); (Ex. 7).  The asterisks indicates terms that are defined separately in the Code of Judicial Conduct.

[125]*Republican Party of Minnesota v. White*, 416 F.3d 738 (8th Cir. 2005) (en banc), *cert. denied*, 125 S. Ct. 1165 (2006), *opinion on remand after grant of rehearing*.

personally sign fundraising letters to constituents.  The Eighth Circuit  found the solicitation

clause was not narrowly tailored to serve the compelling state interest of judicial independence

or impartiality under either interpretation provided by the Supreme Court.  The court found that

it was not narrowly tailored to serve the interest in lack of bias against a party because the ability

of a candidate to sign a contribution letter would not

> magically endow him or her with the power to divine, first, to
> whom that letter was sent, and second, whether that person
> contributed to the campaign or balked at the request. . . . [A]
> candidate would be even less able to trace the source of funds
> contributed in response to a request transmitted to large assemblies
> of voters.[126]

The court additionally found that the clause was not narrowly tailored to serve the state interest

in open-mindedness because it specifically disallows the candidate from even knowing the

identity of contributors.  Under either interpretation, the court found that the clause did not pass

strict scrutiny.

In *Weaver v. Bonnor*,[127] the Eleventh Circuit also struck down a solicitation clause under

the rationale provided in *White*.  The court held that the provision failed strict scrutiny because

candidates were completely chilled from speaking to potential contributors and from speaking

about endorsements.[128]  The court explained that the fact that judicial candidates require financial

support and public endorsements does not suggest that they will be partial if they are elected and

the provision for a committee solicitation alternative does not reduce the risk of impartiality.

"Successful candidates will feel beholden to the people who helped them get elected regardless

---

[126]*Id.* at 765–66.

[127]309 F.3d 1312 (11th Cir. 2002), *reh'g & reh'g en banc denied*, 57 Fed. App'x 416 (11th Cir. 2003).

[128]*Id.* at 1322–23.

of who did the soliciting of support."[129]

### 1. Facial Challenge

#### *Strict Scrutiny*

The Court applies strict scrutiny to determine the constitutionality of the solicitation clause for largely the same reasons it has applied strict scrutiny to the previously discussed canons. The solicitation clause prohibits discussion by the judicial candidate or judge and his or her constituents for the purpose of soliciting public support or contributions. Plaintiffs focus only on the public support portion of the clause, while defendants emphasize the contributions portion of the clause, arguing that this provision demands a lower standard of scrutiny. The Canon at issue here is much different than the laws considered under the line of cases cited by defendants that use a lower standard of scrutiny. Those cases deal with campaign contribution limits, and have been found to "entail only a marginal restriction upon the contributor's ability to engage in free communication."[130]  In contrast, the solicitation Canon at issue here restricts the candidate's speech, not the contributor's speech, and unlike the contribution cases, is not tied to amounts of contributions. The Court finds that this clause prohibits an entire class of speech relating to campaigns, which is intended to influence voters in the election.[131]  As already discussed, this type of content-based prohibition involves "core political speech" and requires that the regulation be narrowly tailored to serve a compelling government interest.[132]

---

[129]*Id.* at 1323.

[130]*E.g.*, *McConnell v. FEC*, 540 U.S. 93, 134–35 (2003) (discussing the communicative value of contributions and their ability to "facilitate the speech of their recipients.").

[131]*See White*, 416 F.3d at 764; *Weaver*, 309 F.3d at 1322.

[132]*See White*, 536 U.S. at 774.

Along with judicial impartiality, defendants argue that the solicitation clause serves the compelling state interest of "protecting the judiciary from the corrupting effects of personal solicitation of funds by judicial candidates."  Short of arguing that they do not focus on the contribution portion of the solicitation clause, plaintiffs do not discuss this particular explanation of the state's compelling state interest in the solicitation clause. The Court finds that this recitation of the compelling interest at stake is one and the same as judicial impartiality, meaning bias against parties and open-mindedness.  Corruption of the judiciary is only a state interest because such corruption could lead to preferential treatment of litigants who contribute funds to the judge's election campaign.  Further, "'[o]pen-mindedness,' in Justice Scalia's terminology, is in reality simply a facet of the anti-corruption interest that was recognized in *Buckley v. Valeo* and subsequent campaign finance cases."[133]

Plaintiffs challenge only the portion of the solicitation clause that prohibits candidates from soliciting publicly stated support.  They do not challenge the prohibition on solicitation of campaign contributions.  Yet, plaintiffs ask the Court to facially invalidate the entire judicial Canon, so the Court considers the strict scrutiny test as it relates to the entire provision.  In her concurrence in *White*, Justice O'Connor commented as follows on the necessity of campaign contributions and endorsements in contested judicial elections:

> [C]ontested elections generally entail campaigning. . . . Unless the pool of judicial candidates is limited to those wealthy enough to independently fund their campaigns, a limitation unrelated to judicial skill, the cost of campaigning requires judicial candidates to engage in fundraising.  Yet relying on campaign donations may leave judges feeling indebted to certain parties or interest groups.  . . . Even if judges were able to refrain from favoring donors, the

---

[133]*White*, 416 F.3d at 769 (Gibson, J., dissenting) (citing *Buckley v. Valeo*, 424 U.S. 1, 26–27 (1976)).

> mere possibility that judges' decisions may be motivated by the
> desire to repay campaign contributors is likely to undermine the
> public confidence in the judiciary.[134]

Justice O'Connor concurred to express her view that if a state chooses to select its judges

through the process of judicial elections, it has "voluntarily taken on the risks to judicial bias"

due to the very nature of election campaigns.[135]

The Court finds that the solicitation clause is not narrowly tailored to serve the

compelling state interest in impartiality, either meaning bias against parties or open-mindedness.

The fact that judicial campaigning requires candidates to garner public support and campaign

contributions does not, in itself, suggest that they will be partial to their endorsers or contributors

once elected.  The solicitation clause in Kansas creates a barrier to personal solicitation by

requiring it be conducted by a committee.  But the committee provision only bolsters the

argument that the solicitation clause is an underinclusive regulation to serve the state interest of

impartiality.  The Canon does not prohibit all solicitations, only those made in person.  Like the

pledges and promises and commit clauses, the recusal canon is narrowly tailored to cure any

impartiality that may result from a candidate personally soliciting support or contributions.  If

such solicitation prevents a successful candidate from being impartial in any specific case or

controversy, that candidate has an obligation to recuse himself or herself.  The Court finds that

the solicitation clause fails strict scrutiny because it is not narrowly tailored to serve the

compelling government interest in judicial impartiality.

Like the clauses in Canon 5A, Canon 5C(2) is also impermissibly overbroad because it

---

[134]*Republican Party of Minn. v. White*, 536 U.S. 769, 791 (2002) (O'Connor, J., concurring).

[135]*Id.* at 792.

40

chills protected speech even if only enforced against those engaged in unprotected activities. Even if the Court accepts the argument that the Panel's interpretation of the canons is not binding on the Commission or the Kansas Supreme Court, they still have the effect of chilling protected speech. There is a real and substantial amount of protected speech that is chilled by the solicitation clause. The clause affects speech by all judicial candidates during election campaigns. The state's effort to limit the inherent effects of elections on the public's confidence in judicial impartiality, chills protected political speech.

Plaintiffs were on notice that personally soliciting nomination petition signatures or answering the Questionnaires could violate Canon 5C(2) based on the Panel's advisory opinions in JE 117 and 100. Because they were on notice, the Court finds that their state of mind was inconsistent with a vagueness challenge.

### 2. As-Applied Challenges

Plaintiffs challenge the application of the solicitation clause to both the Questionnaire and the nomination petition. The enforcement of the solicitation clause as applied to the Questionnaire is in dispute. The Panel issued JE 100 in 2000, a split panel decision that advised a judge against responding to a newspaper questionnaire that posed certain questions about the judge's legal and political views, because it would constitute a request for public endorsement, in violation of Canon 5(C)(2). The minority argued that the newspaper not only used the responses to determine endorsements, but also to provide information to its readers about the candidates—a "vital service." But, the Commission rejected the majority view of this advisory opinion, adopting the minority view that the judge may respond but be mindful of the canons "and particularly Canon 5."

41

The Court finds that application of the solicitation clause to the Questionnaire fails strict scrutiny and is overbroad.  Allowing a judicial candidate or judge to answer the Questionnaire would not damage the state's interest in an impartial judiciary.  First, unlike the newspaper endorsement in the 2000 JE opinion, KJW does not send out its Questionnaire for the sole purpose of determining which candidate to endorse.  Instead, KJW intends to publish the answers to these Questionnaire in order to provide information to voters about the candidates.  The Court fails to see how answering the Questionnaire, for the purpose of educating voters as a whole, would contribute toward impartiality for or against certain parties or thwart open-mindedness.  There is no way that the judicial candidate could glean which voters responded favorably or unfavorably to his or her responses to the Questionnaire.  Further, although answering the Questionnaire may inform voters of judicial candidates' views, there is no evidence that a judge would not be able to remain open to persuasion, for the same reasons described under the Court's analysis of the pledges and promises and commit clauses.  Again, the recusal Canon serves as a safeguard against any threat to judicial open-mindedness based on a candidate's answers to the Questionnaire.

The Panel also issued JE 117 in March 2004, which found that Canon 5(C)(2) does prohibit a candidate from soliciting signatures on nomination petitions.  The Court finds that this too is an unconstitutional application of the solicitation clause because the prohibition is not narrowly tailored to serve either compelling state interest in impartiality.  A candidate is required to obtain signatures of at least 3% of the total of the current voter registration of the party designated in the district.[136]  A signature on a nomination petition falls far short of an

---

[136]K.S.A. § 25-205(e)(3).

endorsement by a citizen and does not necessarily mean that the signatory will vote for the

candidate.  It is difficult to understand how the prohibition serves the interest in preventing bias

for or against parties given the large number of signatures the judicial candidate must collect for

the nomination petition.  Further, there is no indication of how collecting signatures on the

nomination petitions would in some way hurt the successful candidate's "willing[ness] to

consider views that oppose his preconceptions, and remain open to persuasion, when the issues

arise in a pending case."[137]

## IV.  Remaining Preliminary Injunction Factors

### A.  *Irreparable Injury*

Having determined that plaintiffs have met the first prong of the preliminary injunction

test on two of the three challenged canons, the Court now turns to the second prong and

determines whether they will suffer irreparable harm if the preliminary injunction is not

imposed.  "The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."[138]  Plaintiffs have met their burden of

demonstrating that their protected speech will be curtailed if the preliminary injunction is not

granted because, at a minimum, Canons 5A(d)(i) and (ii) and 5C(2) chill plaintiffs from

answering the Questionnaires and collecting nomination petition signatures.

Furthermore, plaintiffs will suffer irreparable injury if the Questionnaire responses are

not allowed to be published prior to the election.  Although it is unclear if KJW will be able to

publish the answers to the Questionnaire prior to the August 1 primary, they will certainly be

---

[137]*See White*, 536 U.S. at 778.

[138]*Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005).

able to publish the results prior to the November election if the injunction is granted.

### B.  Harm to Others

The Court also agrees that the threatened injury to plaintiffs outweighs any injury to defendants if a preliminary injunction is issued.  Defendants argue that they will suffer harm if judicial candidates are able to engage in unprotected speech during the election campaign.  But the Court has already determined that plaintiffs are likely to succeed on the merits of their claim that two of these three canons are not narrowly tailored to serve a state interest in prohibiting truly unprotected speech.  The recusal Canon will still be an available mechanism for judges who make statements during the campaign that render them impartial in a particular case or controversy.

### C.  Public Interest

The Court also finds that issuing a preliminary injunction is not adverse to the public interest because it preserves voters' ability to learn vital information about the judicial candidates and because it protects both the candidates' and judges' free speech and KJW and the public's right to receive such speech.

### V.  Motion to Consolidate

Plaintiffs ask that the Court consolidate the preliminary injunction hearing with a trial on the merits under Fed. R. Civ. P. 65(a)(2).  Plaintiffs argue that there are no factual issues present and that the "case will not change as a result of a hearing on the merits."

Both the Supreme Court and the Tenth Circuit caution that the parties receive clear and unambiguous notice of the court's intent to consolidate "either before the hearing commences or

at a time which will still afford the parties a full opportunity to present their respective cases."[139] The Tenth Circuit has explained that this is primarily because there are such different procedures that accompany preliminary and permanent injunctions.[140]  Additionally, the injunction standard of probability on the merits is not the same as actual success on the merits.[141]

The Court denies the motion to consolidate.  First, the relief sought in this case is more than the injunctive relief sought in the preliminary and permanent injunctions because plaintiffs additionally seek declaratory relief.  Further, the Court did not give the parties notice of an intent to consolidate before the preliminary injunction hearing or at a time that would still afford them a full opportunity to present their cases.

## VI.  Conclusion

In sum, the Court finds that the plaintiffs have sustained their burden of proving each of the four elements necessary to obtain a preliminary injunction.  The Court finds that plaintiffs are substantially likely to succeed on the merits of their claims concerning the pledges and promises, commits, and solicitation clauses under *Republican Party of Minnesota v. White*.  Although the pledges and promises and commit clauses may be narrowly tailored to further the state's compelling interest in judicial impartiality and the appearance of judicial impartiality, meaning "open-mindedness," the overbreadth of these clauses unconstitutionally chills a real and substantial amount of protected speech.  While these clauses may be narrowly tailored in terms

---

[139]*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 753 (10th Cir. 1987).

[140]*See N. Arapahoe Tribe*, 808 F.2d at 753 (citing *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747 (1986); *Camenisch*, 451 U.S. at 395).

[141]*Id.*

of their purpose, the scope of their sweep renders them unconstitutional.

The Court finds that plaintiffs are substantially likely to show that the solicitation clause, on the other hand, is not narrowly tailored to serve the compelling state interest in judicial impartiality under either meaning of impartiality.  The Canon is underinclusive and fails to address problems of partiality that are inherent in a system of judicial elections.

The Court takes this opportunity to point out that although the preliminary injunction in this case will allow judicial candidates the opportunity to make certain statements in the context of their campaigns, they are by no means *compelled* to do so.[142]  "[T]he practice of *voluntarily* demurring does not establish the legitimacy of *legal compulsion* to demur."[143]  Further, the recusal Canon operates as a check against any statements made that could later render a judge impartial in a particular case or controversy.

This Court follows the Supreme Court's opinion in *White* and finds certain Kansas judicial canons unconstitutional.  As the Supreme Court explained, the "disparity" between the practice of popular elections for judges, and the model judicial canons, which are drafted by the ABA, is not surprising given the ABA's opposition to judicial elections.[144]  The Court further stated that although this

> opposition may be well taken (*it certainly had the support of the Founders of the Federal Government*), . . . '[T]he greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance.  If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the

---

[142]*See White*, 536 U.S. at 783 n.11.

[143]*Id.*

[144]*Id.* at 787.

participants in that process . . . the First Amendment rights that attach to their roles.'[145]

The purpose of the judicial canons is not only to regulate the behavior of the judiciary, but also to instill public confidence in the judiciary.  Yet, as Justice O'Connor observed in her concurrence in *White*, necessary corollaries to the electoral process such as the potentially political consequences of legal decisions and fundraising, undermine public confidence in the judiciary.  Despite the existence of compelling arguments against the practice of judicial elections, the State of Kansas has opted to allow for judicial elections on a district by district basis.  Because the State has voluntarily allowed for this method of judicial selection, the candidates should be allowed to educate the voters about themselves without fear of discipline.

### IT IS THEREFORE ORDERED BY THE COURT THAT:

1.  Plaintiffs' Motion for Preliminary Injunction (Doc. 5) is **granted in part**, with respect to Kan. S. Ct. R. 601A, Canon 5A(3)(d)(i) and (ii) and 5C(2), and **denied in part** with respect to Canon 3E(1);

2.  Plaintiffs' Motion to Consolidate (Doc. 2) is **denied**; and

3.  Defendants are enjoined and prohibited from enforcing Kan. S. Ct. R. 601A, Canon 5A(3)(d)(i) and (ii) and Canon 5C(2) against any candidate for judicial office, including an incumbent judge.  The injunction does not in any way limit or prevent the recusal of a candidate who is elected based on any statement he or she may make during the election.

### IT IS SO ORDERED.

---

[145]*Id.* at 787–88 (emphasis added) (quoting *Renne v. Geary*, 501 U.S. 312, 349 (1991)).

Dated this 19th day of July 2006.

                       S/ Julie A. Robinson
                      Julie A. Robinson
                      United States District Judge